### No. 3.

### SAME agt. SAME.

*March*, 1881.

MOTION by prisoner's counsel for a stay of proceedings, with a writ of error.

*R. W. Peckham* and *M. D. Conway*, for prisoner.

*D. Cady Herrick*, district attorney, for People.

WESTBROOK, *J.* — The bill of exceptions prepared on the part of the prisoner, to review his conviction and sentence for the crime of perjury, has been settled and signed, and application is now made for a writ of error with a stay pending such review. The allowance of the writ is a right which must be accorded to the prisoner (3 *R. S.* [*6th ed.*], 1037, *sec.* 27), but the stay is not (*id., sec.* 28). This proposition is not disputed by his counsel, but they insist that as the case presents a novel and important legal question, the doctrine enunciated by judge EDMUNDS in the cases of *Sullivan and Clark* (1 *Parker*, 347), and by judge WRIGHT in that of *Hendrickson* (*id.*, 396), that when the question involved is a grave one, and has never been passed upon by either "the supreme court in bank or the court of appeals," a stay ought to be granted, should apply.

Certainly every human judgment is fallible, and I am profoundly conscious that any conclusion of my own, formed during the pressure of a trial, may be erroneous, and that

other judges, who by law review my action, may differ from and reverse me, even though my determination was reached after full deliberation. If, however, such reasoning should influence judges in allowing stays in criminal cases, then upon every conviction which had been resisted by able and ingenious counsel, justice would be postponed to the indefinite future, and such confessed uncertainty in the administration of punishment, would encourage crime to an extent which would be simply intolerable.

The cases to which counsel referred were capital, and, as in such, if the execution of judgment be not stayed, errors would be irremediable, good sense and humanity both require that the prisoner should be afforded an opportunity for review, unless the exceptions relied upon are clearly frivolous. This proposition was affirmed by myself in two cases (*Hilaire Latrimouille*, *Henry Moet*), and is sound; but such rule should not be applied to all criminal convictions, and especially to the present, because:

*First.* Its adoption, as has already been stated, would, by destroying all respect for the promptness of justice, stimulate and encourage crime. In *People* agt. *Holmes* (3 *Parker's Criminal Reports*, 507), it was said by ROOSEVELT, J.: "It will thus be seen that the prisoner has a strict right to the review, but not to the stay. The stay is a matter of discretion to be exercised only on good cause shown. Of what avail, it may be said, will be review after imprisonment has been suffered? On the other hand, of what avail, it may be, asked, would be criminal trials, if in every case the execution of the sentence were to be delayed by review, at the mere option of the criminal? No man sentenced, either to death or imprisonment, would voluntarily submit. Writs of error would be universal. Promptitude and certainty, so essential to the punishment of crime, would be entirely defeated, and the whole register of criminal administration would become paralyzed." The views of the learned judge are not harsh, but eminently sound. Absolute freedom from error is impos-

sible in a human tribunal, and even after conviction and its affirmance in every appellate court to which it can be taken, we are not absolutely sure that some ruling made upon the trial may not be technically erroneous, and that the judgment of some minds would not so pronounce it. No person can undergo criminal punishment at all unless he has been convicted in a manner known to the law, and when a conviction has been had in the highest court of original criminal jurisdiction in the state, the execution of judgment should not be deferred, unless, in the opinion of the judge to whom the application is made, there is reasonable ground to believe that error has been committed, or unless irremediable injury will be done by such execution upon a party in regard to whose actual criminality there is reasonable doubt, should the conviction be reversed. Without claiming to be infallible, my own judgment is clear that no error has been committed, and even though some technical cause for reversal should be found, the possibilities of such a result should not defer and suspend punishment, because :

*Second.* The moral guilt of the prisoner cannot be questioned, and the legal is almost equally clear, for by the evidence given on the part of the people, it is reasonably certain that an oath in the prescribed statute form was actually administered. His name was subscribed to a statement, partly written and partly printed, which declared that he had been " duly sworn," and on such oath verified an account against the county of Albany, and upon that statement there was also a certificate of an officer authorized to administer oaths, to the effect that the oath which the prisoner declared he had in fact taken, had been administered by such officer. This deposition signed by the prisoner, and to which he had also publicly declared he was sworn by its use to procure the audit and allowance of his claim, was indisputably, beyond doubt or cavil, willfully and corruptly false. The officer, whose name was appended to the jurat, testified that an oath was actually administered — the prisoner also, as has just been stated, so

declared over his own signature penned by his own hand, and proof of such subscription of his name by the prisoner to the deposition, and of the signature of the officer to the jurat, without any further or other testimony, made a clear *prima facie* case, at least, and perhaps a conclusive one (*Regina* agt. *Turner*, 2 *Carrington & Kirwan*, 732, 735, 736; *and also note at end of case*) of the lawful administration of an oath. To all this proof, in regard to which there was no dispute, the only defense of the prisoner was an attempt to prove by some witnesses, who claimed to have been present when the alleged affidavit was signed, that there had been no formal administration of an oath in audibly uttered and spoken words. The claimed error was the charge of the court upon that defense, which instructed the jury that if the prisoner did, by written and printed words, declare to the magistrate that he was testifying on oath, with the intent so to testify, and if the magistrate's certificate of the administration of an oath was given with the understanding and belief that such a declaration on oath was made to him for the purpose of having him (the officer) so state by his official certificate, then a lawful oath had been administered. Grant, for the sake of argument, the legal inaccuracy of this charge, it is yet undeniably true that the prisoner presented a false and fabricated bill against the county of Albany, which the positive testimony of the commissioner of deeds and his own subscribed statement proved, was in fact formally verified by an oath legally administered, and that, therefore, he is probably legally and certainly morally, deserving of punishment. In such a case there should be no stay to enable the prisoner to see if, by some technicality, he may not escape that desert which every right-minded person will declare to be richly his due.

*Third.* It is said that the charge enunciated a new rule of law. It would, I think, be more accurate to say that an old rule of law was applied to a case in which application no reported adjudication, yet found, has either approved or condemned it. Certainly the cases cited in a former opinion

abundantly establish that forms in oaths are immaterial, and that any form to which a party assents as binding is valid. Mere intention to swear, without any declaration, is certainly ineffectual. But a declaration by a person to an officer authorized to administer oaths audibly uttered, that on his oath he deposes to the truth of certain facts stated to the officer is, when made and certified to by such officer for use in a proceeding authorized by law, a valid and legal oath; and as a declaration may be made as well by written as by spoken words, it is impossible, it seems to me, to read the document to which the prisoner has appended his name, and the jurat to which the officer has subscribed his official signature, with a knowledge of the conceded fact that each name was written when the two were in personal contact for the purpose of having the same verified by the former, without reaching the conclusion that an oath binding in law was, in fact, administered. The delivery of the written and printed deposition, signed by the prisoner in his own name and by his own hand, to an officer to be certified as sworn to was a declaration — as perfect and complete as though audibly uttered, or written upon a separate paper and subscribed by the prisoner — by the former to the latter that he (the former) regarded himself, to use his very words, as " duly sworn," and what he assented to as an oath is one in fact and in law. The only error in the charge, if any, was in its leaning to the prisoner. The jury was instructed that if the prisoner did not intend by what he did to take an oath then he had not been sworn, or to use other words, if he intended openly to declare he was sworn, whilst mentally he was shamming and lying to the officer, so that he might obtain an official certificate of the lawful administration of an oath, in order to defraud the taxpayers of Albany county, then by such mental intent he could escape the legal consequences of his morally criminal conduct. In my judgment this charge was too unfavorable to the people. That which a party declares to an officer or court is an oath, and so declares for the purpose of inducing official action

The People agt. O'Reilly.

thereon, should always be so treated, and he should not be allowed to escape justice by the technical plea that he did not intend an oath binding on his own conscience but only intended to make the court or officer who accepted it as such so believe.

The rule of law as contained in the charge really gives to a person an opportunity to lie for his own advantage in judicial and other proceedings without the consequence of punishment, and without the restraining influence of the fear thereof upon the conscience. The jury should, therefore, have been instructed that if the prisoner did declare to the commissioner of deeds by either written, printed or spoken words, or by signs, that on his oath he verified the statement by him subscribed, with the intent to have the officer so believe in order to procure the latter's certificate of the lawful administration of an oath, to be used for a purpose authorized or required by law, and the officer, having thus been induced to believe that the affiant was sworn in a manner binding upon his conscience, gave to him such a certificate, which the affiant used for a purpose in which the law required or authorized the use of an affidavit, then they should, for the purposes of that trial, regard the prisoner as having been regularly and legally sworn. In other words, perjury can be committed by willfully false statements made either by speech or writing, or by signs, to an officer or court authorized to administer an oath, if given under what the party declares by words or signs to such court or officer to be a form and manner of its administration binding upon his conscience, and which is so accepted and received, even though the party did not in his heart and conscience intend to take one. The instruction to the jury covered this and more. It was important for them to find an intent of the prisoner to make the officer believe that the former regarded himself as sworn in a manner obligatory upon his conscience, but it was not important to find that he really regarded himself as under the obligation of an oath. In finding such intent, the written and printed declaration subscribed by the prisoner — to the jurat upon which he had obtained by his

The People agt. O'Reilly.

request personally communicated, the officer's signature, which was placed thereon in his presence, and he, by silent acquiescence, at least, if not by words, assenting to the truth of the statement signed by the officer that an oath had been administered — was important testimony to be considered. They could not fail to remember that conceding the absolute truth of all that the prisoner sought to prove on the subject of the administration of an oath, still it was indisputable, upon the testimony of his own witnesses, that he had sought the commissioner to have an affidavit taken for use in a proceeding in which the law required one; that the two being together, the prisoner declared to the commissioner, by a written and printed declaration formally subscribed with his own name by his own hand, that he was making before him a deposition on oath, to which fact he wished the commissioner to certify; that the commissioner, to whom such declaration was thus made and such wish expressed, accepted the written and printed words so subscribed in lieu of an audible utterance by the prisoner to him of words of similar import, of which acceptance he distinctly informed the prisoner, by appending his official signature to the jurat in the presence of such prisoner; that the delivery of the subscribed declaration which stated to the officer that the prisoner on oath deposed to its truth, with a request that it should be certified as sworn to, and the giving of such certificate at his request, was in fact the verification thereof by an oath administered; and that the document having thus become both in form and substance a completed affidavit, was used by the prisoner in a legal proceeding in which he knew it would surely be regarded as valid, and that such use by the prisoner thereof was an additional and a clear proclamation by himself that he had in fact been duly and regularly sworn. What inference did these undisputed facts require from the jury, or from any tribunal to which they were submitted? Can the words, which the affidavit and certificate contain, and which (the handing of the document from the one to the other, as each

had subscribed his name to his own statement, clearly shows) were exchanged between the commissioner and the affiant when they were in personal contact, be expunged? It was well said by DAVIS, J., in *Matter of Haller* (3 *Abbott's New Cases*, 65), in deciding what was a solicitation of alms under our statute, that " in many instances words are far less effective to accomplish the end than simple acts." Bearing this truism in mind, can, it may also be asked, not only the words which the deposition contains, but also all the attending circumstances of the interview between the prisoner and the commissioner be made meaningless upon the theory advocated by counsel that the prisoner intended not to swear but to cheat and deceive the officer, and thereby procure a certificate of the lawful administration of an oath obligatory upon his conscience, in order that without the risk of punishment for perjury he might defraud an already burdened public? Such reasoning does not commend itself either to the judgment or to the conscience. Men's intents and purposes must, in the administration of oaths for judicial and other legal proceedings, be judged of by what they do and by what they say, either in spoken or written words or signs, and not by their concealed and unuttered mental purposes and reservations. To hold otherwise is opening wide a door for fraud and wrong to enter.

The discussion of this question ought not to be closed without a statement of the inevitable consequences to individuals and to the public, both in reference to past and future transactions, provided the rule enunciated upon this trial as governing the administration of an oath be held to be erroneous. Justice is every day administered upon the faith of papers supposed to be affidavits, because, like the one to which the prisoner appended his name and procured the certificate of the officer, they seem to be regular and valid. Very often parties cause their own affidavits to be presented, and upon them ask for judicial or other action authorized by law. Upon the assumption of the regularity of the oath, which

The People agt. O'Reilly.

the face of the papers declare, most important questions have been and are continually determined. Titles have been passed, and orders granted, in which affidavits are required to give jurisdiction, involving immense values. All these are liable to be overturned and invalidated, provided that which the prisoner claimed to be the law regulating the administration of an oath is correct. Not only will much of past action be rendered nugatory, but in all future administration of justice the danger of such a result will compel courts and officers to require the personal presence and examination of all parties and persons, whenever proof must be made by affidavit to justify action. In no other way will there be safety in legal procedure or certainty in the administration of justice, for thousands of affidavits in the past have been and as many more in the future will be taken precisely as the defense claimed that of O'Reilly was. Common practice has sanctioned what is now claimed to be illegal, and an analysis of what must necessarily occur under such circumstances shows, as has been demonstrated, every necessary ingredient of an oath actually taken. Neither reason nor justice requires the adoption of the principle claimed by the defense, and the serious consequences, which are sure to follow from any such rule of law if adopted, should cause a court to hesitate in giving to it its sanction.

For the reasons which we have stated, the application for a stay of proceedings is denied.